Gove v. Colborn.

*Mr. W. S. Stuhr,* for appellants.

*Mr. J. B. Vredenburgh,* for respondents.

*v.*

JAMES C. DENMAN, respondent.

PER CURIAM.

This decree unanimously affirmed.

---

HENRY F. GOVE et al., appellants,

*v.*

LAURA A. COLBORN, respondent.

Bills for relief.　On final hearing on pleadings and proofs.

*Mr. H. C. Pitney,* for appellants.

*Mr. John Linn* and *Mr. Wm. H. Davis,* for respondent.

On appeal from a decree of the chancellor, who filed the following opinion, May term, 1882:

THE CHANCELLOR.

These two causes were argued together. One is a suit to set aside, on the ground of surprise, a sheriff's sale under foreclosure proceedings, and the other to enforce a mining agreement. The connection of the two subjects will appear by the subjoined statement. On the 9th of April, 1877, Francis N. Gove, who was then the owner of a tract of land (containing minerals) of about seventy-five acres, in Morris county, leased the lands and mines to David B. Jardine for five years, at a royalty of fifty cents per ton of twenty-two hundred and forty pounds for all ore mined, raised and carried away from the demised premises during the term. On the 28th of the same month Gove made an assignment to Cornelius L. Leport, under the assignment act of this state, for the equal benefit of his creditors; which trust Leport accepted. On the 7th of July, in the same year, Jardine assigned the lease to Mrs. Leport, the wife of Cornelius L. Leport, and she, on the 28th of August following, assigned it to Henry F. Gove (son of Francis N.), who, on the 31st of that month, leased the mine, with all the engines and machinery on the demised premises, to the complainant, at the same royalty. That lease contained an agreement that Francis N. Gove should have the exclusive privilege of doing the work of the mining, raising and delivering (the delivery to be on board the Delaware, Lackawanna and Western railroad at Shippenport) of all the ore to be mined and raised during the continuance of the lease, and that the complainant should pay him the sum of $3 per ton for each and every ton of iron ore so raised and delivered. And it was thereby further provided and agreed that Francis N. Gove might at pleasure, at any time, relinquish that privilege, in which case the complainant was to do the work and pay the royalty; and that while he (Gove) did the work and received the $3 per ton, she was to be released from payment of the royalty. And the complainant thereby bound herself to advance to him $1,000, half on the execution of the lease and the rest in sixty

Gove *v.* Colborn.

days thereafter, to be repaid to her by him, without interest, *pro rata,* within four months after he should have mined, raised, delivered and received payment for the first one hundred tons; and that she, her heirs and assigns, would mine, raise and remove, or cause to be mined, raised and removed, five thousand tons of ore a year, during the continuance of the lease, or on failure to do so should, at the option of Henry F. Gove, her lessor, surrender and forfeit her rights under the lease. And it was further agreed (though no such provision was in the lease to Jardine, and Henry F. Gove had no interest in the property except as lessee) that the complainant should have the right of renewal for a further term of fifteen years from the expiration of the lease, on terms of purchasing the machinery and paying a royalty of seventy-five instead of fifty cents. She and her heirs and assigns were to have the right to terminate the lease on six months' notice in writing. Francis N. Gove guaranteed the fulfillment of the lease on the part of his son, the lessor, and Daniel K. Colborn, the complainant's husband, gave a like guaranty for her. By a supplemental agreement, made September 2d, 1878, between the parties to the lease, it was agreed that Francis N. Gove would put the mine in working order, and that the $1,000 were advanced to him for that purpose, and that he would take out and deliver at least five thousand tons of ore a year, unless the mine should fail; and that there should be no forfeiture for failure to mine so much in the year so long as he should work the mine under the before-mentioned agreement contained in the lease. On the 1st of October, 1878, Harry G. Blackwell, by agreement with Francis N. Gove, began to mine under the complainant's agreement with the latter, and continued to do so until the last day of February, 1878, when he quit mining; but for three months afterwards he kept a watchman at the mine. Of the $1,000 the complainant paid, according to the receipts, half on the 3d of September, 1878, and the rest on the 8th of November following, she paid to Francis N. Gove, on account of the work to be done by him in mining, raising and delivering ore under the agreement, $2,100 more in November and December, 1878, and January, 1879. No more payments

were ever made. Blackwell furnished the complainant with about four hundred and fifteen tons of ore on the order of Mr. Colborn, the complainant's husband and agent. Mr. Colborn could not find a profitable market for any more, and therefore ordered him to send no more. Blackwell, or Francis N. Gove, in his stead, urged Mr. Colborn to furnish more money in December, 1878, or January following. He did not furnish it, and the work, therefore, stopped. Blackwell says he stopped because he could not get money enough to pay his men or store-bills, or to repair machinery. The mine lay idle from that time until September, 1879, when Francis N. Gove himself took possession of and operated it, and he has worked it ever since. When the lease was made to the complainant there were two mortgages on the property, one originally for $1,000 and interest, dated November 1st, 1873, given to and held by Abraham D. Salmon, and the other for $3,000 and interest, dated January 29th, 1877, given to and held by James W. Valentine. Under foreclosure proceedings upon the former mortgage (the holder of the other being a party to the suit and proving his claim), the property was advertised for sale, the sale to take place on the 3d of March, 1879. Mr. Colborn, having heard that the property was so advertised for sale, caused an examination of the title to be made by his attorney, who investigated it and reported upon it. A few days afterwards the complainant obtained from Mr. Leport his confirmation, as husband, of the assignment of his wife to Henry F. Gove, and his confirmation as assignee of Francis N. Gove, of the lease from Henry F. Gove to the complainant. In order, as the complainant alleges, to prevent sale of the property and to protect her lease, George Clarke, from whom she had borrowed the money she had paid under the agreement, afterwards obtained an assignment of the interest of Salmon and Valentine, under the decree in the foreclosure suit, by paying the amount due thereon. After those assignments had been made there was negotiation between Francis N. Gove and Clarke with a view to the taking, by the latter, of a lease for the premises, the lease of the complainant, in that case, to be annulled. The negotiation failed. In December, 1879, the com-

plainant made an agreement with Alexander Elliott to sell him twelve thousand tons of the ore, for future delivery, at $4 a ton, payable in advance, the ore to be delivered in lots of one hundred tons each, on the railroad cars at Shippenport, or on the Central railroad at Drakesville, as Elliott should direct. Gove refused, not only to furnish any ore to Elliott, but to anyone else, on the complainant's order. The sale of the property under the execution was adjourned, from week to week, until the 5th of January, 1880, when the sheriff, at the request of Mr. Leport, the assignee, and against the earnest remonstrance of Mr. Davis, the solicitor of Mr. Clarke, and of the complainant, put up the property for sale and struck it off on a single bid of $10,000, to James Sutherland, whose attendance at the sale to buy the property Francis N. Gove had procured, lending him $4,000 for the purpose of paying the percentage which might be required to be paid on the sale. The sheriff, in a very few days afterwards, delivered the deed for the property to Sutherland.

By one of these suits the complainant seeks to set aside the sale as a surprise, and as fraudulent as against her; and by the other she seeks to obtain what she regards as her rights under the lease. That the sale was a surprise upon the complainant there can be no doubt; and it is manifest that if it be permitted to stand, the very provision (the purchase of the decree) made for her protection against Gove will have been made the means of effectuating the purpose against which she sought to guard herself. It is clear that the fact that the sale took place was really due to Gove alone. He produced the only bidder, having previously provided him with the means to purchase the property on that day, and it is not denied that the purchase was made in Gove's interest. The property, it may be remarked, appears to have been sold for an inadequate price. Clarke has obtained title, by purchase, to all the claims except two (together amounting to less than $30) which were proved against Gove's estate. If the complainant is not to be held to have abandoned her lease or to have forfeited all claim to the aid of equity, the sale ought to be set aside. The sheriff's deed was, as before stated, delivered in a very few days after the sale, and the purchaser appears

to have given, before the filing of the bill, a mortgage of $3,000 on the property, to raise purchase-money. The holders of that mortgage should have been parties to this suit.

To consider the merits of the controversy as to the complainant's claim under the lease : The complainant advanced to Gove $3,100 between the 2d of September, 1878, and the 29th of January following. For this she has received only about four hundred and fifteen tons of ore, equivalent to about $1,600. In December, 1878, or January, 1879, Gove and Blackwell urged Mr. Colborn to advance more money, untruly representing that there were three thousand tons of ore mined and on the bank, while in fact there were less than fourteen hundred. He did not advance the money, however. He says the reason was that he heard of the encumbrances on the property, and was unwilling to make any more advances until some arrangement had been made as to them. About that time Colborn appears to have ascertained, for the first time, that the property was advertised for sale under foreclosure proceedings, and Clarke, to befriend the complainant by assisting her to hold the lease, and thus secure himself against loss for his advances of money to her (for she had obtained all the $3,100 from him), immediately set about obtaining control of the mortgages, and got it accordingly. And he otherwise (by obtaining the instruments of confirmation) fortified the complainant's title to the lease. It is urged that Mr. Colborn was well aware of the existence of the mortgages before the lease was made; and in this connection, it may be added, it is also said that he or his attorney was at the same time told that the lease was legally of no binding effect whatever. It is enough to say on both those points that if (and there is a contrariety of evidence on the subject) the complainant or her agent or attorney was, when the lease was made, apprised of the fact that there were encumbrances on the property, it is quite evident that they were led to suppose that they were in hands entirely friendly, and that no trouble or disturbance was to be apprehended from them ; and it is very improbable that the complainant would have advanced over $3,000, as she did, on a lease that she was informed, when she entered into it, was legally entirely worthless.

It is a significant fact, in this latter connection, that the lease was drawn by Mr. Leport, the assignee, himself, who appears to have accompanied Gove as his counsel in the negotiation; and, moreover, it may be added, the assignee in February, 1879, solemnly confirmed the lease.

According to the evidence, the lease was not only not intended to be a fraud on Gove's creditors, but it was regarded, both by Gove and his assignee, as a legitimate means of enabling the former to pay off, by means of the royalty, the claims of his creditors against him. Gove was at liberty, at his pleasure, to surrender the privilege of mining, but he did not do so. On the contrary, he proceeded with the work in October, 1879; and when, in December following, the complainant had found a purchaser for twelve thousand tons of the ore, to be paid for in advance, in lots of one hundred tons each, Gove refused to deliver the ore or recognize the complainant's right to it. There is no evidence that the complainant intended to abandon the lease. The evidence adduced by Gove on the subject shows only a desire on his own part to substitute, if he could, a lease with Clarke as lessee for the lease to the complainant. He did not take the steps necessary, under the lease, to put an end to it. If he was unwilling to work under the agreement which it contained, he should have notified the complainant of the fact. He did not do so, but, as before stated, continued to work under it. The non-payment of the money due him under the agreement did not work a forfeiture of the lease; nor could there be any for non-payment of royalty or failure to take out ore while he continued to work the mine under the agreement; for, by the terms of the agreement, there was to be no forfeiture for failure to pay royalty, or to mine less than five thousand tons a year during that time. Nor can the complainant, under the circumstances, be defeated in her claim under the lease by the fact that the original assignee had no power, as assignee, to recognize the lease. As before shown, the rights of the creditors under the assignment are not involved in this controversy, Clarke having acquired them all with the exception of two insignificant claims (the owners of which cannot be found), which can be perfectly

protected consistently with the enforcement of equity between the real parties to the controversy, the complainant and Gove. There will be a decree in the one suit when all the necessary parties shall have been brought in, that the sheriff's sale be set aside, but on such terms as to protect the purchaser and his mortgagees, whose mortgage will be set aside with the setting aside of the sale.   The $4,000 paid to the sheriff appear to be in his hands yet, and he still holds the check given to him by the purchaser for the balance of the purchase-money.   There will be a decree in the other suit securing to the complainant the benefit of the lease.   And Francis N. Gove will be decreed to pay the costs of each suit.

PER CURIAM.

This decree unanimously affirmed.